WALKER STEVENS CANNOM LLP
HANNAH LYNN CANNOM (SBN 245635)
hcannom@wscllp.com
500 Molino Street, Suite 118
Los Angeles, California 90013
Telephone:     (213) 712-9145
Fascimile:     (213) 403-4906

WUERSCH & GERING LLP
KEVIN F. MURPHY (*pro hac vice*)
kevin.murphy@wg-law.com
MICHAEL J. SENZER (*pro hac vice*)
michael.senzer@wg-law.com
100 Wall St., 10th Floor
New York, NY 10005
Telephone:     (212) 509-5050
Facsimile:     (212) 509-9559

Attorneys for Defendant EKSTER INC.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| THOMAS PURCELLEY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>EKSTER INC., a Delaware corporation; and DOES 1 to 10, inclusive,<br><br>Defendants. | Case No. 2:23-cv-07908-WLH-JC<br><br>**DEFENDANT EKSTER INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Motion Date: August 16, 2024<br>Time: 1:30 p.m.<br>Department: 9th Floor, Courtroom 9B<br>Judge: Hon. Wesley L. Hsu |

1
2

# **TABLE OF CONTENTS**

I.   INTRODUCTION ..................................................................................... 1

II.  EKSTER'S PRICING PRACTICES AS A MATTER OF RECORD ................. 3

III. THOMAS PURSCELLEY, THE ONLY PROPOSED CLASS
     REPRESENTATIVE.............................................................................. 5

    A. Mr. Purscelley's Interest in Wallets ...................................................... 5

    B. Mr. Purscelley Purchases One Ekster Wallet ......................................... 5

    C. Plaintiff Demonstrates How One Not of the Proposed Class Would Act ........ 6

    D. Plaintiff's Inability to Discern How He was Damaged .............................. 7

IV.  PACIFIC TRIAL ATTORNEYS ............................................................... 8

V.   THE REQUIREMENTS OF CLASS CERTIFICATION ............................... 11

VI.  INDIVIDUAL ISSUES PREDOMINATE IN THIS OVERBROAD
     PROPOSED CLASS ............................................................................ 12

    A. Ekster Customers Were Not Uniformly Exposed to Strikethrough Pricing ... 13

    B. Plaintiff's Proposed Timing for the Class is Overbroad ............................ 14

    C. Plaintiff's "One or More Products" Approach Sets Up an Unmanageable
       Mess at Trial ............................................................................... 15

    D. Individual Issues Also Predominate Because No Reasonable Consumer
       Would Have Concluded Ekster Artificially Inflated its Prices .................... 16

VII. PLAINTIFF'S FAILURE TO SUPPORT DAMAGES WITH EXPERT
     TESTIMONY REQUIRES DENIAL OF CERTIFICATION .......................... 17

    A. Plaintiff Cannot Sustain a Claim for Full Restitution .............................. 18

    B. Plaintiff's Arguments are Not Admissible Evidence Supporting
       Certification ................................................................................ 18

VIII. CONCLUSION ................................................................................. 20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF AUTHORITIES**

Page(s)

<u>Cases</u>

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ......................................................................................16

*Astiana v. Kashi*,
  291 F.R.D. 493 (S.D. Cal. 2013)...................................................13, 15, 17

*Berger v. Home Depot USA, Inc.*,
  741 F.3d 1061 (9th Cir. 2014) ...................................................................13

*Brazil v. Dole Packaged Foods, LLC*,
  660 F. App'x 531 (9th Cir. 2016) ........................................................18-19

*Bruno v. Quten Res. Inst.*,
  280 F.R.D. 524 (C.D. Cal. 2011) ..............................................................16

*Bruton v. Gerber Prods. Co.*,
  No. 12-CV-02412-LHK, 2018 WL 1009257 (N.D. Cal. Feb. 13, 2018)..............20

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ..................................................................................3, 17

*Doninger v. Pac. Nw. Bell, Inc.*,
  564 F.2d 1304 (9th Cir. 1977)...................................................................12

*Fitzhenry-Russell v. Dr. Pepper Snapple Group., Inc.*,
  326 F.R.D. 592 (N.D. Cal. 2018) ..............................................................15

*Guido v. L'Oreal, USA, Inc.*,
  Nos. CV 11-1067 CAS JCx, CV 11-5465 CAS (JCx), 2013 WL 3353857 (C.D. Cal. July 1, 2013) ........................................................18

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992)....................................................................12

*Hawkins v. Kroger Co.*,
  337 F.R.D. 518 (S.D. Cal. 2020).............................................................18

*In re Apple Inc. Secs. Litig.*,
  No. 4:19-cv-2033-YGR, 2022 WL 354785 (N.D. Cal. Feb. 4, 2022) ....................8

*In re ConAgra Foods, Inc.*,
   90 F. Supp. 3d 919 (C.D. Cal. 2015) ........................................................................ 19

*In re Hyundai & Kia Fuel Econ. Litig.*,
   881 F.3d 679 (9th Cir. 2018) ................................................................... 12, 13, 14

*In re NJOY, Inc. Consumer Class Action Litig.*,
   120 F. Supp. 3d 1050 (C.D. Cal. 2015) ........................................................ 3, 8, 19

*In re NJOY, Inc. Consumer Class Action Litig.*,
   No. CV 14-428-JFW (JEMx), 2016 WL 787415 (C.D. Cal. Feb. 2, 2016) ...... 19-20

*Konik v. Tim Warner Cable*,
   No. 07-763 SVW (RZx), 2010 WL 8471923 (C.D. Cal. Nov. 24, 2010) ............. 16

*Lilly v. Jamba Juice Co.*,
   308 F.R.D. 231 (N.D. Cal. 2014) ............................................................................ 19

*Saavedra v. Eli Lilly & Co.*,
   No. 2:12-cv-9366-SVW (MANx), 2014 WL 7338930 (C.D. Cal. Dec. 18, 2014)
   .................................................................................................................................. 20

*Stearns v. Ticketmaster Corp.*,
   655 F.3d 1013 (9th Cir. 2011) ................................................................................ 17

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ..................................................................................... 2, 12, 13

*Zakaria v. Gerber*,
   No. LA CV 15-00200 JAK (Ex), 2016 WL 6662723 (C.D. Cal. Mar. 23, 2016) . 14

<u>Statutes</u>

Cal. Bus. & Prof. Code §§ 17200 ................................................................................. 1

Cal. Bus. & Prof. Code §§ 17500 ................................................................................. 1

Cal. Bus. & Prof. Code § 17501 .................................................................................. 9

Cal. Civ. Code §§ 1750 ................................................................................................ 1

<u>Rules</u>

Fed. R. Civ. P. 23(a) ................................................................................................ 2, 11

Fed. R. Civ. P. 23(b)(1)–(3) ........................................................................................ 12

1

Fed. R. Evid. 702 ....................................................................................3

2

Regulations

3

16 C.F.R. § 233.1(a) ...............................................................................9

4

Other Authorities

5

Cal. Prac. Guide Fed. Civ. Pro. Before Trial § 10:412...............................................15

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.     INTRODUCTION

Some class action cases address important public concerns with compelling evidence of wrongdoing, among these: the *Johns-Manville* asbestos cases, the tobacco cases and the *Bendectin* litigation.  A small subset of cases brought as purported class actions, however, do not address public concerns at all, but are nothing more than attempts to smear legitimate businesses under the veneer of the public interest.  Sadly, this action brought against Ekster Inc. ("Ekster"), a seller and manufacturer of innovative wallet and everyday carry products, falls into the smearing subset.

Before presenting products to the market, Ekster, like any other business, prices each product to achieve a certain minimum gross margin and stay in business.  (Dkt. 61-16, Ex. 14 at 26–28.)  These prices were recorded in a price book and vary by product Stock-Keeping Unit ("SKU").  Once on the market, Ekster offers variable discounts from these price book prices by SKU, where a consumer accepts the product at its discounted price or not.  Ekster has thus done nothing wrong under any of the California consumer protection statute or common law claims alleged.[1]  Ekster established its prices, maintained those prices, and offered customers an opportunity to buy on occasion at reasonable discounts.

Mr. Purscelley stands alone as the only potential class representative in an action where he alleged fraudulent pricing not only against Ekster, but against ten unidentified Doe Defendants.  Months have gone by in discovery.  No other defendant has been impleaded, and now Plaintiff is beyond the time permitted to implead another defendant under the Scheduling Order.  Plaintiff, however,

---

[1] Plaintiff asserts four causes of action: (1) California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*.; (2) California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq*.; (3) California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq*.; and (4) Fraudulent Concealment.  (*See generally* ECF No. 49). The UCL, FAL, and CLRA are collectively referred to herein as the "California Consumer Protection Statutes."

perversely demands a class period beginning in August 2020, a time before Ekster even came into existence (in 2021).  While Plaintiff may be able to meet certain of the Rule 23 class certification criteria,[2] he cannot meet either the key issues of predominance or viable damages, and should be denied certification.

*First*, Plaintiff has not offered any evidence that the entire class, or even most of the proposed class members, saw the challenged strikethrough pricing.  Each price is based on a particular Ekster SKU, some of which are subject to strikethrough pricing, while others are not.  Only consumers interested in a particular product would see that a strikethrough price, were one offered, was associated with that product.

*Second*, Plaintiff has not shown that any of the challenged strikethrough pricing is advertised as a former price, and thus subject to the California Consumer Protection Statutes, or the underlying FTC regulations, which describe former prices as being specifically advertised as former prices.

*Third*, individual issues predominate over any common ones, as Plaintiff has acted as no reasonable consumer would act to reach the wholly erroneous conclusion that Ekster has engaged in fraudulent pricing.  In fact, had Plaintiff done his homework as any reasonable consumer would have done, he would have understood that Ekster had established similar pricing throughout similar products, and was offering the same prices on its Amazon.com store.  The Supreme Court in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), emphasized that plaintiffs cannot plead their way to certification, and must provide evidence to meet Rule 23's requirements.  Yet Plaintiff has not offered a customer survey, an expert opinion, or any other evidence that the entire class would view strikethrough pricing as deceptive, particularly when such prices can be matched against prices on the very same products offered on Amazon.com.

---

[2] While vigorously disputing the merits, Ekster concedes numerosity, commonality, and typicality under Fed. R. Civ. P. 23(a).  Adequacy of either counsel or representative is not conceded, and is left to the discretion of the Court.

*Fourth*, Plaintiff has not provided a "rigorous" damages model capable of calculating class-wide damages consistent with his theory of liability, as required by *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).  Under this Circuit's jurisprudence, damages based on alleged misrepresentation under the California Consumer Protection Statutes requires determining the "price premia" associated with the misrepresentation, taking into account the "difference between the market price actually paid by consumers and the true market price that reflects the impact of the unlawful, unfair, or fraudulent business practices."  *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1122 (C.D. Cal. 2015).  Such analyses must account for both consumer preferences, reflected in market demand, and objective factors reflected in market supply.  *Id.*  As noted, Plaintiff's purported class action case has no one to testify on these matters but Mr. Purscelley, who offers anything but expert testimony.  No case in this Circuit has allowed price premia damages, and the complex survey and economic calculations necessary in a class action, to be admitted through lay testimony.  Indeed, in many instances, this Court and its sister courts have struck proffered expert testimony on the subject as unreliable under Rule 702 of the Federal Rules of Evidence.  *See*, *e.g.*, *id.* at 1119 (rejecting expert damages model as it looks only to the demand side of the equation, converting an objective analysis into a subjective one).  Mr. Purscelley's "analysis," even were it otherwise qualified, is also focused only on the "demand side" of true market value, doing nothing to account for varying market supply, seriously constrained during the purported class period by the immediate and after-effects from the COVID-19 pandemic.  Mr. Purscelley also made no effort to obtain a consumer survey to broaden his own consumer preferences to adequately represent the broad class proposed.  This Court in its discretion may deny certification on that ground alone.

## II.   EKSTER'S PRICING PRACTICES AS A MATTER OF RECORD

Ekster is an e-commerce company selling premium cardholder wallets and a range of other "everyday carry" products. Ekster was incorporated in Delaware on

May 5, 2021. *See* Declaration of Kevin Murphy ("Murphy Decl.") ¶ 2. Since incorporation, Ekster has offered its products to California residents through multiple channels, including on its website https:///www.ekster.com (the "Ekster Website"), and on the Ekster webstore at www.Amazon.com (the "Ekster Amazon Store"). *See generally* Dkt. 48. Only Ekster's sales activity on the Ekster Website is challenged in this lawsuit, but Ekster's practices on the Ekster Amazon Store are relevant herein.

In order to succeed in a competitive market, Ekster runs periodic sales on its products. Declaration of Thomas van der Kolk ("T. van der Kolk Decl.") ¶ 3. As the undisputed evidence of record demonstrates, Ekster advertises its list prices on the Ekster Website and on the Ekster Amazon Store through a price book devised before any sales price is generated.  (T. van der Kolk Decl. ¶ 4; *see also id.* Ex. 1.) For its wallet products, a consumer visiting the Ekster Website may select an Aluminum Cardholder, a Parliament Cardholder, or a bifold wallet.  (*Id*. ¶ 5.) Each wallet is sold under a particular SKU and at a particular price, fixed in advance. (*Id*.) When Ekster offers a sale on its products, Ekster displays these list prices with a line through them, or strikethrough, near the sales price, demonstrating that the product is now available at a discounted sales price. (*Id*.) At no time did Ekster ever describe this list, or reference, price as a former price. (*Id*.)

Plaintiff made just one purchase from Ekster—an Aluminum Astral wallet on August 1, 2023 (Ekster SKU: EK-ALU-ATL).[3]  (*See* Dkt. 49, Am. Compl. ¶ 21.) He purchased no other product from Ekster apart from this one wallet, and never contemplated purchasing anything else from Ekster in the period from August 2020[4] through 2024.  (*See* Murphy Decl., Ex. 1 (T. Purscelley Tr.) at 47:18–48:20). Moreover, the Astral wallet which Plaintiff purchased was a limited run item.  (T.

---

[3] Plaintiff initially alleged he had purchased a Gunmetal Gray wallet, an Ekster product with a separate SKU. (Dkt. 1-1, ¶ 17.)
[4] Indeed, the first available date any such purchase could have been made was May 5, 2021.

van der Kolk Decl. ¶ 6.)  Ekster established the list price for the Astral Wallet sold in January 2023 of $99 (T. van der Kolk Decl., Ex. 1, DEF0000212, Pricebook Tab, Cell I73), later in 2023 modifying its list prices by increasing the price by one dollar to $100, in an effort to maintain Ekster's image as a valuable brand.  (*Id*. ¶ 6.)

## III.  THOMAS PURSCELLEY, THE ONLY PROPOSED CLASS REPRESENTATIVE

Only one Plaintiff presents himself as representing the class for purchasers somehow "duped" by Ekster's pricing policy—Mr. Purscelley himself.  Mr. Purscelley has had limited jobs as he served for most of his adult life in the state correctional facility in Ironwood, California, following his conviction for murder in 2009.  (Murphy Decl., Ex. 1, 8:2–9, 114:1–7.)  Presently, he works as a manager in his wife's restaurant Lunas Bar and Grill in San Gabriel, California.  (*Id*. at 12:11–12, 13:24–14:5, 15:13–14.)  While Mr. Purscelley's employment and educational background are limited as a result of his circumstances, he is however aware that each product in the marketplace carries specific prices based on its SKU, as he had worked prior to his incarceration as an inventory specialist for RGIS Inventory Services.  (*Id*. at 12:5–8, 67:7–11.)

### A.  Mr. Purscelley's Interest in Wallets

For some years, Mr. Purscelley carried a Hugo Boss wallet.  (*Id*. at 25:2–5.)  On or about June 18, 2023, for Father's Day, Mr. Purscelley's daughter purchased a Louis Vuitton wallet for him.  (*Id*. at 24:20–25:1.)  These brand-name wallets retail for about $350 each.  (*Id*. at 26:8–9, 26:13–17.)  Mr. Purscelley conducted no particular research into wallets prior to this time.  (*Id*. at 44:16–24.)  He began using the gifted wallet immediately.  (*Id*. at 26:23–24:7, 64:21–22.)

### B.  Mr. Purscelley Purchases One Ekster Wallet

On or about August 1, 2024, Mr. Purscelley began a search for another wallet on Google, which led him to the Ekster Website.  (*Id*. at 30:9–10.)  He spent no more than about 15 minutes perusing the site and purchased an Ekster Astral Wallet for $80.  (*Id*. at 33:20–34:3.)  He does not remember seeing any other site, including

the Ekster Amazon Store, or investigating any further.  (*Id*. at 30:11–18.)  He believed that $80 was a "good price," particularly over the $100 advertised "strikethrough" price.  (*Id*. at 34:4–11.)  Records show that Mr. Purscelley's purchase was registered on the Ekster Website at 6:05 a.m. Central European Time on August 2, 2023.  (Murphy Decl., Ex. 2, Purscelley000005.)  Thus, he purchased the Ekster Astral Wallet at 9:05 p.m. Pacific Time on August 1, 2023.

Mr. Purscelley then went back to the Ekster Website and spent another 15 minutes looking through approximately ten of the Ekster Website pages. (*See* Murphy Decl., Ex. 1, 50:10–12, 50:17–19.)  He came to the dubious conclusion following this review that he felt "misled" because the Ekster Astral Wallet he purchased was "never on sale." (*Id*. at 91:19–21.)  He then reached out to Pacific Trial Attorneys on August 1, i.e., purportedly the very same evening after his purchase (or between 9:20 p.m. and midnight on August 1, 2023).  (Murphy Decl., Ex. 3, Plaintiff's Am. Resp. to Interrog. No. 6.)  Mr. Purscelley admits that he had no way of actually knowing any of Ekster's pricing history for any product. (Murphy Decl., Ex. 1 at 50:20–23.)  Indeed, he had never seen the Ekster Amazon Store (*id*. at 86:11–14), and could not know that Ekster set its strikethrough prices on its price book months before Mr. Purscelley ever purchased the Ekster Astral Wallet.  (*Id*. at 104:3–13; T. van der Kolk Decl. ¶ 6.)

### C.     Plaintiff Demonstrates How One Not of the Proposed Class Would Act

Mr. Purscelley never considered seeking a refund for being misled.  (Murphy Decl., Ex. 1 at 40:20–21.)  He never reviewed Ekster's refund policy—which offers returns within 100 days—or indeed any of Ekster's terms and conditions on the Ekster Website.  (*Id*. at 34:22–35:4; 40:23–24.)  He "love[s]" the Ekster Wallet: "[i]t's a great product," as it lines up credit cards "one underneath the other." (*Id*. at 40:2–19.)  Presently, he uses the Ekster wallet 50% of the time.  (*Id*. at 64:23–65:3.) In stark contrast to his retention of the Ekster wallet, whenever dissatisfied with any other product, Mr. Purscelley does not hesitate to return it, having returned the

following products for a refund, among others: "shoe rack;" "restaurant stuff;" "seven pairs of shoes;" "15 pairs of pants;" "belts;" "underwears [*sic*];" "lots of clothing;" "electronic equipment;" "Braun razor;" "Dyson vacuum cleaner;" "furniture;" and "tools."  (*See generally id*. at 57.)

Plaintiff proposes a class definition of "[a]ll persons who purchased one or more of Defendant's products from Defendant's Website while in California from August 1, 2020, through the present (the 'Class Period') at a discount from a higher reference price and who have not received a refund or credit for their purchase(s)." (Dkt. 49 (Am. Compl.) ¶ 51.) But Mr. Purscelley feels that he does not represent "***all*** people who purchased" products including wallets.  Rather, he believes the class aggrieved is all "people who purchased wallets [which] were falsely advertised on the Ekster website."  (Murphy Decl., Ex. 1 at 95:7–13.)  Thus, precisely no one apart from himself.  Plaintiff has never been in any position based on his own failure to investigate Ekster's pricing to allege that Ekster has duped anyone.  This failure has only been compounded by Pacific Trial Attorneys' failure to uncover anything suggesting that Ekster did anything wrong.

### D.    Plaintiff's Inability to Discern How He was Damaged

Nor does Mr. Purscelley have anything to impart on behalf of the proposed class when it comes to damages issues.  According to Mr. Purscelley, although his operative complaint demands monetary damages, including restitution, he cannot "put a specific dollar value" on his claim.  (*Id*. Ex. 1 at 91:25–92:3; *see also id*. at 93:5–8 (cannot provide a claim "in monetary value. I can't give you a dollar amount").)

Indeed, Mr. Purscelley can shed very little light on what the actual value of his much-admired Ekster Astral Wallet is and how that might relate to the plaintiffs in the proposed class.  In lieu of such an analysis, the Plaintiff leaves the question up to the Court.  (*Id*. at 93:17–25 ("I would rely that up to the judge").)

Plaintiff did provide a potential method by which an expert could determine value.  In his deposition, he assessed various items he thought were an important

component of any assessment of value.  For example, on a scale of 1 (least important) to 5 (most important), he determined that price, limited availability, and quality and materials are the most important means to assess value, rating them each a 5.  (*Id*. at 42:20–43:9; 43:18–20; 44:3–5.)  He assessed as less significant both the utility of the product and its branding (both rated a 3, *id*. at 43:21–25), and how others respond a zero (*id*. at 44:1–2). Notably, he knew of none of these appreciable qualities when he reached out to Plaintiff's counsel to file a complaint.  He would not receive his wallet until later in the month.  In any event, such assessments of value are common in expert opinions with respect to misrepresentation cases, as the plaintiff in such cases must provide the misrepresentation price premia, that is the difference between the price at which a misrepresented product is offered versus its actual market value.  Fatal to any certification, however, Plaintiff's motion is devoid of any such analysis or supporting expert opinion.  *See, e.g.*, *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1122 (C.D. Cal. 2015) (rejecting certification based on insufficient proffered expert evidence); *In re Apple Inc. Secs. Litig.*, No. 4:19-cv-2033-YGR, 2022 WL 354785, at *13 (N.D. Cal. Feb. 4, 2022) (rejecting inflation ribbon theory for valuation of misrepresentation on Apple options).

## IV.   PACIFIC TRIAL ATTORNEYS

As noted, Plaintiff reached out to his counsel, Pacific Trial Attorneys, on or about August 1, 2023, who, on August 11, 2023, tried in the initial complaint to support Mr. Purscelley's erroneous conclusion that Ekster never sold its product at its stated reference price.

Pacific Trial Attorneys presumably examined the issue under the Federal Trade Commission regulations (the "FTC Regs."), cited at length in the initial complaint and the operative complaint, *see* Dkt. 1-1 ¶¶ 3, 49; Dkt. 49 ¶¶ 3, 65:

One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the

former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. ***If, on the other hand, the former price being advertised is not bona fide but fictitious – for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction – the "bargain" being advertised is a false one***; the purchaser is not receiving the unusual value he expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price.

16 C.F.R. § 233.1(a) (emphasis added). Thus, under the FTC Regs., the key to determining whether a price is fictitious is in the timing of the sales offer.  If the price existed prior to the offer of a discount, such a practice does not run afoul of Federal Trade Regulations.  To the same end, California's FAL specifies that the advertising of a price as a "former" price is illegal unless that price was the prevailing price for the item and for sale at that former price for a period of 90 days before publication of the price.  *See* Cal. Bus. & Prof. Code § 17501 (2024).

The undisputed evidence of record demonstrates that Ekster advertises its list prices on the Ekster Website and on the Ekster Amazon Store through a price book devised before any sales price is generated.  (*See* T. van der Kolk Decl. ¶¶ 5–6; *see also id.* Ex. 1 (Ekster Price Book).)  At no time did Ekster ever describe its list price as a former price.  (*Id.* ¶ 5.)  Nor did it ever inflate any of its prices on the Ekster Website so it could offer a discount to consumers.  (*Id*. ¶ 6.)

Before the filing the Complaint, Pacific Trial Attorneys apparently at no time examined the Ekster Amazon Store to do a product-by-product comparison to the products offered on the Ekster Website.  Had they done so (and been interested in doing a thorough job), Pacific Trial Attorneys would have determined that many of Ekster's products, particularly its wallets, were offered to consumers on the Ekster

Amazon Store at a ***higher*** price than they were offered on the Ekster Website. (*See* T. van der Kolk Decl. ¶ 10 ("Ekster's products sold on the Amazon Store are generally offered at the same or higher prices than those on the Website, demonstrating lower sales from a higher reference price.").)

Plaintiff's alleged proofs of alleged fictitious Ekster prices using the Internet Archive (a.k.a. the "Wayback Machine") from three dates in 2023—January 23, 2023, May 22, 2023,  June 10, 2023, and June 17, 2023 (*e.g.*, Dkt. 1-1, Compl. ¶¶ 25–26; Dkt. 61-2, Ferrell Decl. Exs. 3–6) are evidence of nothing.  Plaintiff purchased an Astral wallet EK-ALU-ATL, whose price was set in the Ekster price book at $99.  (T. Van der Kolk Decl., Ex. 1, Pricebook Tab, Cell I73).  None of the Wayback Machine images details an Astral wallet.  Rather, referred-to screenshots in exhibits 3–5 concern a Classic Black Aluminum Cardholder, EK-ALU-BLK. (Dkts. 61-5–61-7.) This Classic Black Cardholder was offered from a $90 reference price different from the Astral Cardholder that Plaintiff purchased, and is at best an apples-to-oranges comparison.  (*See* T. van der Kolk Decl. ¶ 7.)  Exhibit 6 is a more generalized screenshot of the wallets Ekster offered, purportedly in or about January 2023.

As a result of these and other problems with Plaintiff's Complaint, this Court dismissed Plaintiff's initial complaint under Rule 9(b) of the Rules of Civil Procedure for Plaintiff's failure to meet the rule's heightened pleading standards. (Dkt. 48.)  The Court held that:

> Even accepting as true—as the Court does here—that Defendant never (or almost never) sells its goods at the Reference Prices as the Complaint alleges, (Compl., Docket No. 1-1 ¶¶ 16–17), the Complaint has failed to plead facts showing that the Reference Price is misleading. That is so because the Complaint contains no allegation that Defendant was the exclusive retailer, such that it is only *possible* that the Reference Price is misleading if Defendant never offered the good at that price. The other possibility, of course, is that the Reference Price is

not misleading at all but rather an accurate reflection of what third-

party sellers charge for the same or similar goods.

(Dkt. 48 at 10.) Plaintiff's counsel—not Plaintiff[5]—then tried to fix the Complaint to now include the Ekster Amazon Store in the First Amended Complaint. The essence of Plaintiff's counsel's newfound issue with the Ekster Amazon Store is twofold. First, Pacific Trial Attorneys alleges that the first time an Ekster Aluminum Cardholder was offered to customers on the Amazon Store was in May 2023, at $89, not the reference price of $100. (Dkt. 49 ¶ 34.) Once again, Pacific Trial Attorneys is mistaken. This is not the Astral Wallet Plaintiff purchased (EK-ALU-ATL) but yet another wallet, known as the Aluminum "Green Ore" wallet, EK-ALU-GRN. (Murphy Decl., Ex. 5). The Green Ore wallet is priced differently at $89 in the Ekster price book for sale on the Ekster Amazon Store. (T. van der Kolk Decl., Ex. 1, Pricebook Tab, cell Q82). Second, now for the first time on its class-certification motion, Pacific Trial Attorneys claims that from time to time, Ekster offers "lightning sales" on its Amazon Store and other discounts. Pacific Trial Attorneys alleged that on 3 days from June 4–7, 2023, and over Black Friday in November (arguably four days from Friday to Cyber Monday), additional discounts were offered. (Dkt. 61-2 ¶¶ 7–24.) This so-called evidence is of no significance as Ekster's prices are defined by its price book before products are offered to the public (T. van der Kolk Decl. ¶ 4), and its reference prices are never advertised as former prices (*id.* ¶ 5). Even if they were, seven (7) days of discounts is hardly evidence that Ekster's products were not offered legitimately to the public.

## V.     THE REQUIREMENTS OF CLASS CERTIFICATION

Under Rule 23(a) of the Federal Rules of Civil Procedure, a plaintiff seeking class certification must demonstrate: 1) the class is so numerous that joinder of all

---

[5] Mr. Purscelley was almost entirely unfamiliar with any addition in the First Amended Complaint, all of which were made by Pacific Trial Attorneys. (*See* Murphy Decl., Ex. 1 at 73:16–84:11 (unfamiliar with paragraphs 19–20; 23; 30–31; 33; 34–35; 36; 37; 39–41; 42; 66; 68; 71–76; 83–85, 87; 97; and 100–04).)

members is not impracticable, 2) there are questions of law or fact common to the class, 3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and 4) the representative parties will fairly and adequately protect the interests of the class. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

A party seeking class certification may not rest on mere allegations, but must provide facts to satisfy these requirements. *Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304, 1309 (9th Cir. 1977). Rule 23(b) must also be satisfied. Under that rule, a plaintiff must also demonstrate either: 1) a risk that separate actions would create incompatible standards of conduct for the defendant or prejudice individual class members not parties to the action; or 2) the defendant has treated the member of the class as a class, making appropriate injunctive or declaratory relief with respect to the class as a whole; or 3) common questions of law or fact predominate over questions affecting individual members and that a class action is a superior method for fairly and efficiently adjudicating the action. *See* Fed. R. Civ. P. 23(b)(1)–(3). Here, as Plaintiff is seeking monetary damages, Plaintiff seeks certification only under Rule 23(b)(3), i.e., that class questions predominate over those relating to him alone. As noted, Plaintiff cannot sustain this "predominance" requirement.

## VI.   INDIVIDUAL ISSUES PREDOMINATE IN THIS OVERBROAD PROPOSED CLASS

"Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Instead, it requires that a plaintiff seeking class certification "*affirmatively demonstrate*" with "*evidence*" that he has satisfied all of Rule 23's prerequisites, and it directs courts to conduct a "rigorous analysis" and to "probe behind the pleadings" to ensure he has done so. *Id*. at 350–51 (emphasis added); *see also In re Hyundai & Kia Fuel Econ. Litig.*, 881 F.3d 679, 690 (9th Cir. 2018) (emphasizing that a plaintiff must "demonstrate through evidentiary proof" that he has satisfied Rule 23).

### A.   Ekster Customers Were Not Uniformly Exposed to Strikethrough Pricing

The Ninth Circuit has repeatedly emphasized that class certification is inappropriate unless the *entire* class was exposed to the challenged advertisement. *In re Hyundai & Kia Fuel Econ. Litig.*, 881 F.3d at 703. Plaintiff pleads a sufficient class action under the California Consumer Protection Statutes only when "the alleged material misstatement and omission was part of a common advertising scheme to which the entire class was exposed, and is a sufficiently definite representation whose accuracy has been legitimately called into question." *Astiana v. Kashi*, 291 F.R.D. 493, 505 (S.D. Cal. 2013).  Both the Ninth Circuit and the California courts have expressly found that "class certification of UCL [Unfair Competition Law] claims is available only to those class members who were actually exposed to the business practices at issue." *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014), *abrogated on other grounds by Microsoft Corp. v. Baker*, 582 U.S. 23, 41 (2017).

While Plaintiff alleges that "every product sold to consumers throughout the Class period conveys the same affirmative message," i.e., was subject to a strikethrough price, *see* Dkt. 61 at 3, Plaintiff provides no proof apart from counsel's statement that various other wallets were sold with a strikethrough price, Dkt. 61-2, (Ferrell Decl.) ¶¶ 4, 5; Dkt. 61-4 (Ex. 2 to Ferrell Decl.).  But as the Supreme Court has emphasized, a plaintiff cannot plead his way to certification.  *Wal-Mart Stores, Inc.*, 564 U.S. at 350.  Contrary to Plaintiff's bare-bones assertions, the record demonstrates that Ekster offered the challenged strikethrough pricing only with respect to select products, such as the Astral Wallet.  (T. van der Kolk Decl. ¶ 6.) Ekster segregates wallet products from its display of everyday carry products on the Ekster Website, which generally do not offer strikethrough pricing.  (*Id.* at ¶ 5.) And Ekster's Amazon Store does not typically offer strikethrough pricing either. (Murphy Decl. Ex. 4, T. van der Kolk Tr. 82:3–12.)  On the Ekster Website, only when a customer is interested in a particular item by clicking through the color

schema can the strikethrough price be compared to the sales price.  (T. van der Kolk Decl. ¶ 5.)  As a result, it is nearly impossible to determine whether any given customer of Ekster wallets, let alone all Ekster products, was even exposed to a product bearing one of the allegedly misleading prices.  As the Ninth Circuit recently pointed out, such a lack of uniform and consistent exposure dooms class certification bids. *In re Hyundai & Kia Fuel Econ. Litig.*, 881 F.3d at 705 (reversing class certification where "factual differences regarding . . . exposure to the misleading statements translate into significant legal differences regarding the viability of these class members' claims").  Moreover, of relevance here, smaller fonts make widespread exposure less likely.  *Zakaria v. Gerber*, No. LA CV 15-00200 JAK (Ex), 2016 WL 6662723, at *8 (C.D. Cal. Mar. 23, 2016) (declining to extend certification given small font in the middle of block of text on back cover).

Plaintiff has not provided any evidence whatsoever that all Ekster consumers saw and based their purchases of Ekster products on Ekster's strikethrough pricing.  No survey is referred to, nor has Plaintiff adduced any marketing material from Ekster relying on such data.

### B. Plaintiff's Proposed Timing for the Class is Overbroad

Plaintiff proposes a class definition as follows: "All persons who purchased one or more of Defendant's products from Defendant's Website while in California from ***August 1, 2020***, through the present (the 'Class Period') at a discount from a higher reference price and who have not received a refund or credit for their purchase(s)."  (Dkt. 49 ¶ 51; Dkt. 61 at 2 (emphasis added).) Plaintiff excludes Defendant's officers, directors, and employees, and any partner or employee of Class counsel.  (Dkt. 49 ¶ 52.)

Ekster, however, is the only named defendant in this case.  Ekster was incorporated on ***May 5, 2021***. (Murphy Decl. ¶ 2.) The Court's Scheduling Order required the parties to implead any additional parties no later than March 29, 2024. (Dkt. 36 at 22.)  Plaintiff has not done so.  Thus, any class period with respect to

1    Ekster could only reasonably begin from May 5, 2021.  This temporal restriction is
2    imposed by reality, and ignored by Plaintiff.

3        **C.    Plaintiff's "One or More Products" Approach Sets Up an**
4             **Unmanageable Mess at Trial**

5        In determining if common questions predominate, the Court identifies the
6    substantive issues related to Plaintiff's claim, then considers the proof necessary to
7    establish each element of the claim, and then considers how these issues would be
8    tried.  *See Fitzhenry-Russell v. Dr. Pepper Snapple Group., Inc*., 326 F.R.D. 592,
9    612 (N.D. Cal. 2018) (quoting Cal. Prac. Guide Fed. Civ. Pro. Before Trial §
     10:412).

10       Where the number of products is limited, class certification presents fewer
11   issues of manageability and is more readily granted.  In *Astiana v. Kashi*, for
12   example, the plaintiffs brought a class action on behalf of consumers who purchased
13   Kashi food products and identified ten (10) specific products with labels claiming
14   "nothing artificial" and ninety-one (91) products claiming "all natural." *Astiana v.
15   Kashi*, 291 F.R.D. 493, 498 (S.D. Cal. 2013). The class was certified with respect to
16   the ten (10) products labeled "nothing artificial" and not certified as to the
17   excessively broad "all natural" class.  The number of products involved for the
18   proposed "nothing artificial" class was small and all products were in one product
19   line, alleviating the court's concerns "that individual purchasing factors for a variety
20   of products would predominate." *Id*. at 505.  Here, Plaintiff neglects to mention
21   exactly how many of "one of more Ekster products" may be in issue should the
22   Court improvidently grant certification.  There are at least ***103*** products Ekster sold
23   during the proposed class period, including at least *36* non-wallet products.  (T. van
24   der Kolk Decl., Ex. 1.)  Ekster has identified 56 wallet products that at one time or
25   another from May 2022 through August 2023 utilized strikethrough pricing.  (Dkt.
26   61-16, Ex. 14 at Ex. A.) Such a wide array of products, and the need for consumer
27   surveys embracing them, would strain the manageability of any trial presentation,
28   and strongly suggests Plaintiff's proposed class should not be certified.  *See*

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615–16 (1997) (court must consider among other factors the "desirability or undesirability of concentrating the litigation of the claims in the particular forum," and the "manageability of the class action").

### D.   Individual Issues Also Predominate Because No Reasonable Consumer Would Have Concluded Ekster Artificially Inflated its Prices

Plaintiff further alleges that he has shown that Ekster's alleged "false reference prices" are "material misrepresentations" under the reasonable person standard. (*See* Dkt. 61 at 13–15.)  Class certification is improper if a plaintiff cannot show "that the challenged statements were actually false as applied to all (or even most) class members."  *Konik v. Tim Warner Cable*, No. 07-763 SVW (RZx), 2010 WL 8471923, at *9 (C.D. Cal. Nov. 24, 2010).  Plaintiff cannot show that members of the class were deceived because they in fact were not.  And Mr. Purscelley's perception that he was somehow deceived rests on his 30-minute cursory review of a website without context and without helpful advice as to how to make sense of what he was looking at.

But Plaintiff's motion utterly fails to proffer evidence of deception.  Plaintiff has failed to show that any consumer purchased a product marketed with a material misrepresentation, such that "members of the public are likely to be deceived." *Bruno v. Quten Res. Inst.*, 280 F.R.D. 524, 534 (C.D. Cal. 2011).  Whatever Plaintiff's ill-conceived conclusion, the record evidence establishes that Ekster determines its prices for its products on a product-by-product basis, using a specific formula to achieve a specific gross margin.  (Dkt. 61-16, Ex. 14 at 26–28.)  Before these prices are offered to the public, they are listed in Ekster's price book.  (T. van der Kolk Decl. ¶¶ 4–5; *id.* Ex 1.)  The price book price determines the reference price for any sale.  (*See* Murphy Decl., Ex. 4 at 35:22–36:21; *see also id.* at 82:3–4 ("[T]he price on Amazon is the price in the price book.").)  Any and all Ekster discounts based on the strikethrough pricing that is the subject of this action directly relates to the Ekster price book. There is no "fictitious" price Ekster ever offered to a customer through strikethrough pricing.

Plaintiff arrived at the highly dubious conclusion that Ekster's prices were fictitious based on slipshod, self-selected data points. Plaintiff conducted a review for 30 minutes or so of the Ekster Website and concluded with metaphysical certainty that: 1) Ekster had not sold any of its products at its reference price, and 2) all Ekster reference prices were fictitious. No reasonable consumer would ever come to that conclusion based on such warped logic. What a reasonable consumer would instead do is analyze Ekster's products on a product-by-product basis, wherever those products are sold, and determine if the reference price was false.  A reasonable consumer would also not label a strikethrough price a former price when it was not advertised as such.  *See, e.g.*, *Kashi*, 291 F.R.D. at 508 (rejecting class certification for customers based on "all natural" claim which consequently inspired different calculations in the minds of prospective customers). As Ekster pricing, or Plaintiff's claims of falsity with respect to that pricing, is not material as to all class members, "the issue of reliance would vary from consumer to consumer and the class should not be certified." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022–23 (9th Cir. 2011) (citation omitted).

This is why only one representative plaintiff, Mr. Purscelley, stepped forward to complain about Ekster's pricing.  Ekster has never received a complaint that any prices were fictitious.  (*See* Murphy Decl., Ex. 4 at 83:3–9.)  It is Mr. Purscelley's perverse interpretations that predominate, not any class or subset of Ekster consumers.

## VII.   PLAINTIFF'S FAILURE TO SUPPORT DAMAGES WITH EXPERT TESTIMONY REQUIRES DENIAL OF CERTIFICATION

In *Comcast Corp. v. Behrend*, the Supreme Court made clear that a party seeking class certification bears the burden of "establishing that damages are capable of measurement on a classwide basis." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).  This necessarily entails a "rigorous analysis" of whether a proposed damages model can accurately "translat[e] . . . the legal theory of the harmful event into an analysis of the economic impact of that event." *Id*. at 35, 38.  A court may

only certify a Rule 23(b)(3) class if "there is evidence demonstrating the existence of a classwide method of awarding relief that is consistent with the plaintiffs' theory of liability." *Guido v. L'Oreal, USA, Inc.*, Nos. CV 11-1067 CAS JCx, CV 11-5465 CAS (JCx), 2013 WL 3353857, at *15–16 (C.D. Cal. July 1, 2013).

### A.    Plaintiff Cannot Sustain a Claim for Full Restitution

Plaintiff has demanded at least partial restitution of his $80 for the purchase of the Astral wallet.  As noted, Plaintiff loves the wallet, is still using it, and has never had any intention of returning it.  Thus, any claim of full restitution may not be had.  "[I]n cases where named plaintiffs seek damages based on a full restitution model, predominance is not satisfied if the named plaintiff or class members received some value from the product."  *Hawkins v. Kroger Co.*, 337 F.R.D. 518, 542 (S.D. Cal. 2020).

### B.    Plaintiff's Arguments are Not Admissible Evidence Supporting Certification

For what appears to be his claim for partial restitution, Plaintiff submitted no expert testimony, but instead mused about the three ways he might calculate damages.  All involve subtraction.  First, he asserts—despite lacking any evidentiary, expert, or even textual support—that Defendant's price differential can be used for each product for which Defendant intentionally inflated its reference prices. (*See* Dkt. 61 at 18.) But Ekster never inflated its reference prices, either intentionally or otherwise. Alternatively, he muses that Ekster's reference and sales prices can be compared by product, subtracting all sales prices from list prices, after the commencement of the action. (*Id.* at 19.) And finally, he suggests that perhaps he should calculate the actual value of what Plaintiff received by calculating the market price of another, comparable product.  (*Id.*)

Under California law, the measure of restitution in a false advertising case is the "price premium" attributable to alleged misrepresentations.  *See Brazil v. Dole Packaged Foods, LLC*, 660 F. App'x 531, 534–35 (9th Cir. 2016) (holding that damages are limited to "the difference between the prices customers paid and the

value of the [product] they bought").  Questions about the price premium in the marketplace are not within the realm of admissible lay testimony, but require the testimony of a properly qualified expert, supported with a reliable methodology. *See Lilly v. Jamba Juice Co.*, 308 F.R.D. 231, 244 (N.D. Cal. 2014) (holding, in wake of *Comcast*, that where defendants make out a prima facie claim showing damages calculation is likely to be complex, expert testimony is a prerequisite for class certification leading to damages).  Typically, a plaintiff presents such evidence in the form of conjoint analyses and hedonic regression analyses. *See, e.g.*, *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1025 (C.D. Cal. 2015) (certifying class based on plaintiff's conjoint accompanied by hedonic regression analysis to assess price premium in class action alleging misrepresentation of cooking oil labels), *aff'd*, 844 F.3d 1121 (9th Cir. 2017).  Conjoint analyses use survey-based statistical techniques to determine how members of a class might value attributes of a product. (Mark Gallagher Decl. ¶ 11.)  Hedonic regression analysis, often used in conjunction with conjoint analysis, attempts to resolve a product into consumer-focused constituent characteristics.  (*Id.*)  Each is a time-honored economic methodology, and conspicuously lacking among Plaintiff's various musings.

Notably, given the rigorous requirements of class certification, even conjoint analysis may be deemed inadmissible, resulting in no certification.  In *In re NJOY, Inc. Consumer Class Action Litig.*, for example, this Court found that the plaintiffs' proffered model "did not satisfy *Comcast*" because it failed to quantify the "price premium" they paid due to claimed misleading advertising for e-cigarettes.  *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1118–19 (C.D. Cal. 2015).  The model proposed provided "what a consumer is willing to pay, without considering other factors in a functioning marketplace."  *Id.* at 1119.  Willingness to pay for products . . . does not permit the court to calculate the true market price of NJOY e-cigarettes absent the purported misrepresentations."  *Id.* at 1122; *see also In re NJOY, Inc. Consumer Class Action Litig.*, No. CV 14-428-JFW (JEMx), 2016 WL 787415, at *7 (C.D. Cal. Feb. 2, 2016) (denying reconsideration

because analysis "still only look[ed] to the demand side of the market equation, and ignore[d] the price at which . . . e-cigarette manufacturers[] would be willing to sell their products").  Similarly, in *Saavedra v. Eli Lilly & Co.*, this court rejected a conjoint model attempting to quantify the value that consumers placed on an alleged misrepresentation regarding risks associated with Cymbalta.  *Saavedra v. Eli Lilly & Co.*, No. 2:12-cv-9366-SVW (MANx), 2014 WL 7338930, at *5 (C.D. Cal. Dec. 18, 2014).  Echoing the *NJOY* Court, the *Saavedra* Court held that "[b]y looking only to consumer demand while ignoring supply," conjoint analysis "converts the lost-expectation theory from an objective evaluation of relative fair market values to a seemingly subjective inquiry of what an average consumer wants."  *Id.*[6]

Even if Plaintiff presented expert testimony on the issues he would like to, his musings simply assume for all class members that a differential between a reference price and a sales price reflects the actual value to the consumer.  Mark Gallagher has testified on expert damages for many years, and in his expert opinion, expert testimony would be necessary for any assessment of market value or price premium on damages.  (M. Gallagher Decl. ¶ 15 & Attachment A.)  Plaintiff comes to the table with no such evidence.  As noted, class certification may, and should, be denied on this ground alone.

## VIII.  CONCLUSION

For the foregoing reasons, this Court should deny Plaintiff's motion for class certification, and grant all other just and appropriate relief.

---

[6] Hedonic regression analysis may also prove deficient. *See Bruton v. Gerber Prods. Co.*, No. 12-CV-02412-LHK, 2018 WL 1009257, at *10 (N.D. Cal. Feb. 13, 2018) (denying certification where regression analysis did not account for advertising, brand loyalty, or other independent variables).

DATED:  June 28, 2024                    Respectfully submitted,


**WALKER STEVENS CANNOM LLP**
By: */s/ Hannah L. Cannom* _____
Hannah L. Cannom (SBN 245635)
hcannom@wscllp.com

**WUERSCH & GERING LLP**
By: */s/ Kevin Murphy* _____
Kevin F. Murphy (admitted *pro hac vice*)
Kevin.Murphy@wg-law.com
Michael J. Senzer (admitted *pro hac vice*)
Michael.Senzer@wg-law.com

*Attorneys for Defendant*
*Ekster Inc.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>CERTIFICATION OF WORD COUNT</u>

      The undersigned, counsel of record for Ekster Inc., certifies that this brief contains 6,987 words, which complies with the word limit.

Dated: June 28, 2024

                                      *Hannah L. Cannom*
                                        Hannah L. Cannom